Brent BROOKS

v.

EAST CHAMBERS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT.

Civ. A. No. G–88–379.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 23, 1989.

Bruce V. Griffiths and Helen Gros, Houston, Tex., for plaintiff.

Karen McNair and E.R. Norwood, Liberty, Tex., for defendant.

## MEMORANDUM AND ORDER

HUGH GIBSON, District Judge.

East Chambers County Consolidated Independent School District approved a plan in August 1988 to require students in grades six through twelve who wish to participate in school-sponsored extra-curricular activities to consent to urinalysis for drugs as a condition to their participation in those activities. On November 1, 1988, the plaintiff Brent Brooks, a senior at East Chambers High School, challenged the constitutionality of the district's drug testing program in a class action suit in this Court. The plaintiff, who participates in the high school's Future Farmers of America program, sought in connection with his lawsuit a temporary restraining order to prevent him from being excluded from an upcoming FFA competition if he refused to submit to a drug test. On the day after he filed his lawsuit, the plaintiff was called to the principal's office to provide a urine sample for testing. He refused, whereupon he was told that he was immediately barred from participation in the school's extra-curricular activities. The next day, the parties agreed to the entry of an order restraining the school district from interfering with plaintiff's taking part in his school's extra-curricular activities or requiring him to submit to urinalysis, pending a hearing on plaintiff's application for a preliminary injunction. Plaintiff's application was heard in a two-day bench trial, and the Court now herein renders its decision on the permanent entry of that injunction.

### 1. Factual Background

The drug testing policy originally in place at East Chambers County Consolidated Independent School District (herein ECCCISD) was adopted by the school board after a small group of parents and students petitioned before it for the institution of more stringent measures to combat drug and alcohol abuse. These families were prompted to appear before the board because their children recently had undergone substance abuse treatment and they did not think the school was dealing with the drug problem effectively.

The school board authorized the principal of East Chambers High School to investigate the matter and make recommendations of what measures could be taken. The principal's investigation of substance abuse at the school primarily consisted of having the three students who had appeared before the school board go through a high school yearbook. After reviewing the yearbook, the boys collectively answered four questions the principal posed to them. Their answers indicated that they had seen aproximately one-third of the high school student body use drugs other than alcohol and they estimated that 97% of the high school student body "use alcohol."

The principal's investigation of available drug testing programs consisted of a telephone survey he conducted of various Texas school districts that were using "innovative" drug prevention programs. He learned of several kinds of programs in place, including systems that encourage anonymous reporting of drug users by fellow students, peer counseling programs in which students are trained to assist fellow

students with substance abuse problems, and a variety of urinalysis programs. The principal submitted a written report to the school board of his findings, but did not make any recommendation.

On August 25, 1988, the school board unanimously adopted the drug testing program currently in place. The school board had already decided at the meeting at which the high school principal submitted his report that the district would go with some form of urinalysis as the means by which to eliminate drugs. The minutes of that meeting do not reflect any particular rationale for the Board's choosing urinalysis over any of the counseling alternatives.

## A. Program Objectives

According to the introduction to the policy implementing the program, drug testing was adopted because:

(1) "Student athletes ... are respected and admired by a large segment of the student body and ... are expected to hold themselves as good examples of conduct, sportsmanship and training...."

(2) "It has been widely recognized that using drugs and alcohol can cause serious ... harm."

(3) "A student who uses drugs can be a danger to himself, his teammates or opponents."

(4) "The schools ... offer extra-curricular participation only to drug-free students."

(5) "ECCCISD has a duty to protect the health and well-being of all its students involved in extra-curricular activities," and

(6) "[E]xtra-curricular activities are ... a privilege."

It should be noted that there is no evidence in the record that the use of drugs or alcohol at ECCCISD creates some particular problem in the school's extra-curricular program. The high school principal testi-

fied that he was unaware of any instance in which drug or alcohol abuse had contributed to an athletic injury or injury sustained in connection with a non-athletic extra-curricular activity. In the course of his seven years on the job, the school superintendent had only heard of two minor instances of disruption of extra-curricular activities by students abusing substances—both instances involving the use of alcohol.

There was further very little evidence that drug or alcohol abuse by ECCCISD students constituted a major problem in the operation of the schools. The high school principal could recall only fifteen drug or alcohol related incidents in the course of his seven years there. Most of these involved alcohol and none involved physical injuries to students. A drug-sniffing dog program, in fact, was discontinued because the dogs did not find enough drugs to justify the program. The school district evidently is responding with its program to a perceived public demand that the schools "do something" about the general societal problem of substance abuse.

## B. Program Procedures

Drug testing began in mid-October. Pursuant to the policy, all participants in fall activities were to be tested once at the beginning of the semester, then to be tested at random throughout the school year, at the rate of thirty students per month. To date, 179 students have been tested from grades nine through twelve (out of a high school student body of 296). With the exception of plaintiff Brooks and one high school band member who refused to consent to the test, the initial testing of all high school participants in fall extra-curricular activities has been completed.[1]

The procedure for collecting the urine sample during the first round of testing emerges from the record as follows:

The administration announced to the student body at the end of August or early

---

1. The policy requires that an initial test be performed on all participants in extra-curricular activities, "when they begin participation." High school students participating in activities that take place in the spring semester, who have not taken part in a fall activity, will not be tested until spring. Last school year, only 13 high school students failed to participate in some extra-curricular activity.

September that testing would begin in six weeks. The student would be summoned to the principal's office by receiving word from his classroom teacher to go to the office and produce a sample. No one made any particular effort to assure that the student did not learn in advance when he would be tested.

Once a student reports to the office, he is brought into the principal's private office, where he is confronted by the principal and the school nurse. The student is asked if he is taking any drugs that might produce a positive test. If the student says "Yes," the principal leaves while the student discloses to the nurse whatever drugs he is taking that might produce a positive result. The nurse records the information on a form that the laboratory provides. The form contains several carbon pages, so that several copies of the drug information is recorded.

The principal then returns and instructs the student to enter the bathroom in the principal's office and urinate into the specimen-collecting vessel, called a "bullet." The student is told not to flush the toilet until he has handed the specimen out the door. The student enters the bathroom alone and closes the full-length opaque door. To prevent the student from adulterating the sample once in the bathroom, the school has cut off the water supply to the sink fixture and added a coloring agent to the water in the commode bowl. While the student is in the bathroom, the principal and the nurse make no attempt to listen for the normal sounds of urination, but do listen for the sound of the toilet flushing.

After the student is finished, he hands the specimen to the nurse, who feels the exterior of the vessel for warmth. The capped vessel is labeled with the student's identification number and put in a bag with the original of the form on which the nurse listed the drug information that the student provided. The principal keeps a copy of the form.

The samples are picked up from the school every day by laboratory employees who carry the samples to Beaumont, from where they are shipped by air freight to the laboratory in Dallas where they are analyzed. The results are reported to the principal. The laboratory does not check positive results against the list of drugs the student has reported taking. The laboratory leaves it to the school district to explore the possibility that the ingestion of some legal substance caused a positive test.

During the course of the litigation, the ECCCISD indicated that it was revising the drug testing program to comply with the newly-enacted Health and Human Services guidelines. *See* § 2.4(g) of HHS Regulations, 53 Fed.Reg. 11983. The details and extent of any revisions, however, is unclear at this time, as is the degree to which the revised program actually complies with the HHS regulations. For example, the written school policy provides, "The testing laboratory shall report all confirmed positive tests to a Medical Review Officer...." The federal regulations, however, specify that "[t]he results (positive and negative) submitted at the same time to the laboratory shall be reported back to the medical review officer at the same time."

The revised program contemplates requiring all students who participate in any extra-curricular activity in grades seven through twelve to submit to one urinalysis for drugs at the beginning of the activity and are subject to being randomly tested during the school year. Twenty senior high students and ten junior high school students will be randomly tested each month. The sanction for refusing to submit to the test is exclusion from extra-curricular activities until the student agrees to be tested. Students who test positive on either the initial test or the subsequent random test are excluded from activities until they submit to a subsequent test, at a time of the student's choosing, which comes out negative. Subsequent positive tests would be punished by progressively longer periods of exclusion from extra-curricular activities.

2. *Federal Constitutionality of the Drug Testing*

 Whenever a constitutional challenge is made to any search or investigation, a

preliminary question must be whether state action is involved. If a search is being conducted by a private entity and not under the color of state law, then it is not subject to the identical scrutiny to which actions of public officials are subject. There can be no question here that the drug testing program instituted by the school board is governmental action. The United States Supreme Court has held expressly that the Fourth Amendment applies to the officials of local public schools:

> It is now beyond dispute that "the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers." *Elkins v. United States*, 364 U.S. 206, 213 [80 S.Ct. 1437, 1441–42, 4 L.Ed.2d 1669] (1960). Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against encroachment by public school officials.

*New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985) (citations omitted).

The proposition that the Fourteenth Amendment protects students in the public school setting is echoed in *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470 (5th Cir.1982). In fact, the *Horton* court simply launches into a Fourth Amendment analysis of dog sniffing in the school district, going straight to the reasonableness question, without any state action analysis. The search of students for drugs by school officials is considered state action. As state action, the school official's conduct falls within the purview of the Fourth Amendment.

■ An analysis under the Fourth Amendment is two-fold: first, is the conduct a search; and second, is the search reasonable. *National Treasury Employees Union v. Von Raab*, — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), definitively and affirmatively answers the first part of the analysis as applied to the ECCCISD urinalysis program. The Fifth Circuit held, and the Supreme Court did not dispute, that drug screening by urinalysis constitutes an infringement on reasonable expectations of privacy and, thus, is a search under the Fourth Amendment. The test is a search regardless of whether the actual act of urination is observed, because the analysis of urine is capable of disclosing facts about which an ordinary citizen has a reasonable expectation of privacy. The Fifth Circuit *Von Raab* opinion notes,

> Urine testing may disclose not only the presence of drug traces but much additional personal information about an employee—whether the employee is under treatment for depression or epilepsy, suffering from diabetes, or, in the case of a female, pregnant. Even tests limited to the detection of controlled substances will reveal the use of medications prescribed for relief of pain or other medical symptoms.
>
> ... [A] finding that urine testing for drugs is not a search necessarily presumes that the ordinary individual's reasonable expectation of privacy would not be offended if the government, even without any articulable basis for suspicion, notified a person who had otherwise been properly stopped (seized, in the legal sense) that he must submit a urine sample for analysis. That presumption simply does not comport with contemporary mores.

*National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175–76 (5th Cir. 1987). The program at the ECCCISD is, without a doubt, a search that raises an issue of legality under the Fourth Amendment.

The constitutionality of a school district's urinalysis program administered to students grades seven through twelve participating in extra-curricular activities is a case of first impression in this district and the Fifth Circuit. Although the set of facts is new, the standard to be applied to them is well-known. The Supreme Court has soundly rejected the proposition that public school officials can search school children only upon obtaining a judicial warrant issued on probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Requiring the schools to obtain a warrant based on probable

cause whenever the need arose would be counterproductive to the special role that the school plays in our society. As the *Horton* opinion states,

> When society requires large groups of students, too young to be considered capable of mature restraint in their use of illegal substances or dangerous instrumentalities, it assumes a duty to protect them from dangers posed by anti-social activities—their own and those of other students—and to provide them with an environment in which education is possible. To fulfill that duty, teachers and school administrators must have broad supervisory and disciplinary powers.

*Horton,* 690 F.2d at 480. The schools would be hindered in carrying out their special functions if they had to execute their disciplinary duties in a rigid legalistic fashion.

■ The consensus of precedent instead calls for the application of an objective reasonableness standard to searches in the schools. *See Horton,* 690 F.2d at 481. Requiring that the school official have "reasonable cause" for his actions is a less stringent standard than that applicable to law enforcement officers, yet requires more of the school official than good faith or minimal restraint. The reasonableness standard involves a two-fold inquiry:

> [F]irst, one must consider "whether the ... action was justified at its inception," second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place...." ... [T]he reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools.

*T.L.O.,* 469 U.S. 325, 343, 105 S.Ct. 733, 743 (citations omitted).

■ The Constitution therefore specifies that under ordinary circumstances a search of a school child must be based on individualized suspicion that the search will discover evidence of wrongdoing. The ECCCISD school officials admit that their testing program is not based on individualized suspicion. In order for the drug testing program to be legal, then, it must have been prompted by circumstances other than ordinary. Further, even if such "extraordinary" circumstances do exist, *T.L.O.* still mandates that the students' Fourth Amendment rights may not be diluted any more than is necessary to preserve order in the schools.

■ A special interest required to justify the urinalysis program could exist in the ECCCISD if it were shown that participants in extra-curricular activities are much more likely to use drugs than non-participants, or that drug use by participants interfered with the school's educational mission much more seriously than does drug use by non-participants. Neither assertion is supported by the evidence.

The first possible argument, that participants are more prone to drug use, finds no support in the record. Moreover, logic would dictate that students who paticipate in athletics and other extra-curricular activities are, in fact, less likely to use drugs and alcohol, if only because Texas law forbids students who fail courses from participating in extra-curricular activities, and presumably, heavy drug or alcohol use will have a negative impact on academic performance.

The second argument, that drug use by participants interferes more seriously with academics than does drug use by non-participants, similarly is unsupported by the evidence. None of the witnesses testified that there was any proof that extra-curricular students are at a greater risk of drug-related injuries than non-participants, or even that student athletes are at a higher risk than non-athletes. Medical expert witnesses for both sides acknowledged that intoxication makes participation in all activities of life somewhat more risky. Neither doctor, however, identified extra-curricular activities as being riskier than other activities associated with attending school. In fact, school authorities could not cite a single drug-related injury in seven years, in the course of either school or after school activities. The justification for the

ECCCISD drug testing program in essence is that their students would be safer in everything they did if they did not use drugs or alcohol. That rationale does not meet the compelling need criteria necessary to undertake a search without reasonable suspicion.

Every court that has considered urine testing of the general student body in a public school has found it unconstitutional. *Anable v. Ford*, 653 F.Supp. 22 (W.D.Ark. 1985); *Odenheim v. Carlstadt–East Rutherford Regional School Dist.*, 211 N.J.Super. 54, 510 A.2d 709 (1985); *Patchogue–Medford Congress of Teachers v. Board of Education*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987) (testing of public school teachers). The Fifth Circuit in *Horton* held unconstitutional a search of public school students by drug-sniffing dogs, despite that the search was considerably less intrusive and considerably more directed toward on-campus drug use than the ECCCISD urinalysis program.

The testing program in place at ECCCISD is the most intrusive of any school district in Texas. It tests the widest range of students, grades seven through twelve—originally grades six through twelve—participating in extra-curricular activities. In the ECCCISD, that is over half the student body. The testing is via urine screening—requiring the tested students to hand a specimen to the school nurse in front of the principal. The program brings a very private function under the rigid scrutiny of school authorities, without any individualized suspicion. It is an across-the-board, eagle eye examination of personal information of almost every child in the school district. It is difficult to imagine any search of school children being more intrusive.

The defendant's drug testing program is further unreasonable because it is not likely to accomplish its ostensible goals. While the discouragement of the use of drugs and alcohol by young people is honorable, if the means of the discouragement are not narrowly tailored to that goal, then they are not reasonable in the constitutional sense.

One of the stated goals of ECCCISD's drug testing program is preventing impaired students from taking part in after school activities. Testing the student's urine weeks or months before he participated in an extra-curricular event, however, does virtually nothing to prevent that from happening. Urine tests do not measure present impairment to begin with and a urine test so remote in time does not give any information about recent drug use that might affect performance.

Deterrence may be cited as another justification. The ECCCISD program nevertheless fails to meet the deterrence goal for a couple of reasons. First, there is no measure of how much of a deterrent the program really is. Unlike drug testing of employees, ECCCISD students are not threatened with loss of employment if they refuse the test or fail it. If a student wishes to continue drug use, he merely has to forego extra-curricular activities. A program that simply encourages drug-using students to give up activities outside of school is not sufficient justification for ignoring students' reasonable expectations of privacy.

Second, the evidence showed that the defendant's procedure for testing is sufficiently lax that it would be possible for guilty students to avoid detection by substituting a drug-free urine sample. In the case of alcohol, the witnesses agreed that detection could be avoided simply by not drinking in the morning. Again, one of the obvious goals of the program, deterrence, is not borne out in practice. Such limited effectiveness hardly justifies the indignity and compromise of principles of freedom and privacy created by urine testing in the public schools.

ECCCISD cites as its strongest legal support for its program the recently decided *Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309 (7th Cir.1988), in which the Seventh Circuit approved a drug testing program closely resembling the defendant's. This Court cannot accept *Tippecanoe* as decisive on the ECCCISD facts because recent Supreme Court precedent would effect a different outcome in *Tippe-*

*canoe* if decided today. Moreover, the law of the Seventh Circuit is different from and less protective of student rights than Fifth Circuit law. Finally, the evidence before the *Tippecanoe* district court was significantly different than the evidence at bar, with the program approved by the Seventh Circuit considerably more limited than the one before this Court.

The *Tippecanoe* decision might have had a different outcome had it been decided after the Supreme Court issued its two opinions on drug testing in the workplace: *Skinner v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The Supreme Court did uphold in those cases government programs which required warrantless urinalysis for drugs of persons whom the government had no reason to suspect as drug users, because the government had a compelling interest sufficient to overcome the testees' legitimate expectation of privacy. Nevertheless, a comparison of the facts of the *Skinner* and *Von Raab* cases with this case demonstrates that the school district's interest in testing its students' urine is much less than the governmental interest that the Court found compelling in *Skinner* and *Von Raab.*

In *Von Raab,* for example, the Supreme Court found that the following factors justified the urine testing:

1) The Customs Service is the "first line of defense" against the importation of drugs, and if an employee involved in drug interception is using illegal drugs in his own time, it increases the likelihood that he will be subject to blackmail.

2) A high level of risk will be imposed on the public and Customs employees by drug-using employees who use firearms.

3) Employees who apply for such sensitive positions have a reduced expectation of privacy because of the nature of the work.

Each of these factors is indeed a strong justification for the imposition of the testing. By comparison, none of the factors apply to school children nor could be analogized to any similar factors in the school setting. School activities, on campus and off, do not carry the inherent risks associated with the enforcement duties with which Customs employees are charged or with the responsibility that railway employees have with heavy machinery and sometimes dangerous cargo. Further, the school environment does not require an automatic forfeiture of certain rights and privacy expectations, as does employment with Customs or in some administrative settings. Every child, at least in Texas, must attend school. School attendance does not trigger an instant diminution of rights.

The intrusion on personal privacy that the school child must undergo in the East Chambers County school system cannot be justified by the global goal of prevention of substance abuse. The urinalysis program is unsupported by the compelling interest the school authorities must have before they can implement the warrantless searches of the pupils. The ECCCISD urinalysis program therefore is unconstitutional and the permanent injunctive relief the plaintiffs seek must be granted.

It is, therefore, ORDERED, ADJUDGED and DECREED that plaintiffs' application for a permanent injunction is GRANTED. East Chambers County Consolidated Independent School District, its officials, employees, agents, and all persons acting in concert with it, are permanently enjoined from interfering with the participation of any student attending school in the district in any curricular or extra-curricular activity by reason of the student's failure to produce a specimen of urine or any other bodily substance for the purpose of its being tested for drug residues.