**William P. TODD and Diana J. Todd, on their own behalf and as next friends for their son, William Matthew Todd; Steve Hammons and Gina Hammons, on their own behalf and as next friends for their children Anne Hammons, Steve Hammons, Jr. and Jennifer Hammons, Plaintiffs,**

v.

**RUSH COUNTY SCHOOLS; Ed Lyskowinski, in his official capacity as Superintendent of the Rush County Schools, Defendants.**

No. IP 96–1417–C–T/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 2, 1997.

Kenneth J. Falk, Indiana Civil Liberties
Union, Indianapolis, IN, for William P. Todd,

Diana J. Todd, Steve Hammons, Gina Hammons.

John O. Worth, Worth Law Office, Rushville, IN, Rodney V. Taylor, Christopher & Taylor, Indianapolis, IN, for Rush County Schools, Ed Lyskowinski.

## ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

TINDER, District Judge.

This matter comes before the court on Plaintiffs' motion for summary judgment under FED. R. CIV. P. 56, and Defendants' motion for summary judgment under the same rule. The court, having considered the motions and supporting briefs, now finds that the Plaintiffs' motion should be **DENIED**, and the Defendants' motion **GRANTED**.

### I. Background Facts and Procedural History

Plaintiffs filed suit on October 3, 1996, claiming a violation both of the Fourth Amendment and the analogous provision of the Indiana Constitution. The case moved quickly through discovery, and the relevant facts stated below were developed. These facts are uncontested.[1]

Rush County is a rural county in Indiana with Rushville (Pop. 6000) as the largest community. There are four elementary schools, one middle school, and one high school which are the public schools for the county. The six schools combined have 3009 students. The high school, Rushville Consolidated High School ("High School"), has 950 students. It covers grades 9 through 12, and is the only high school in the county.

For some time, the High School has had an athletic code in place which suspends school athletes from participation if they use alcohol, tobacco, or illegal drugs, or are arrested. For the 1996–97 school year, 30 athletes were suspended under this code. Most of these were alcohol and tobacco-related.

Smoking is apparently not allowed at the High School.

In 1980, the Rush County Local Coordinating Council for Safe and Drug–Free Schools and Communities ("LCC") was established, partly motivated by state initiatives. The LCC currently has 67 members, including representatives from the county courts, Family and Children's Services, police, and schools. The LCC is funded mainly through fines imposed by the county courts. The LCC is charged with studying the use of drugs in Rush County, and with providing goals and solutions for reducing drug use in the county.

John Wilson ("Wilson") is the Athletic Director of the High School and has been working at the school since 1970. In recent years, he has come to believe that there is a growing problem with drugs at the school. Around 1995, he began to collect information from other school systems in order to develop a proposed drug testing program ("Program") at the High School. This plan was presented to the LCC, which agreed to provide funding for the Program. The Program was reviewed by the Rush County School Board ("Board") in public meetings. There was minimal opposition voiced to the Program at these meetings.

The Board approved the program in August of 1996, and it became effective in October of 1996. The terms of the Program prohibit a High School student from participating in any extracurricular activity or driving to school unless the student and parent or guardian consent to a test for drugs, alcohol, or tobacco in random, unannounced urinalysis exams. "Extracurricular activity" is defined to include not just athletic teams, but all extracurricular clubs such as the Student Council, Fellowship of Christian Athletes, and the Library Club. Students who want to drive to school are also covered by the Program.[2] Once consent is given, partic-

---

1. The Plaintiffs filed a motion to strike various matters submitted by the Defendants in connection with their reply brief. For the most part, the Plaintiffs correctly identified defects in this submission, therefore, the motion to strike is **GRANTED**. The objectionable portions of the

Bet Kotowski affidavit were not considered in connection with this entry.

2. Through popular literature and the news media, the court is aware that there is a growing trend to require breathalyser tests for school functions such as dances. However, in this case,

ipation in these organizations is allowed, and students may be subject to testing at any time. The testing is conducted by Midwest Toxicology Services ("Midwest"), which collects samples, and the Witham Hospital Laboratory Services ("Witham"), which performs the actual analysis. The initial test is paid for by the LCC grant. Each test costs approximately $30.

The tests are conducted in the following way: an RV-type vehicle is brought to the High School. The vehicle has separate areas for males and females. The selected students (around twenty to thirty for each test) are escorted to their respective areas by faculty members. They go into a private space and produce a urine sample. The private area contains only a stool which contains a liquid treated to prevent tampering. Students have two minutes to produce a sample. If a student is unable to urinate, twenty-four ounces of liquid is provided for the student to drink, and an additional two hours are allowed to produce a sample. If a student is still unable to urinate, the student is barred from extracurricular activities pending a retest.

Once a sample is produced, the student gives it to the employees of Midwest, who seal the sample and have the student initial it. Students are supervised at all times except for the time they are in the private area. Midwest then delivers the samples to Witham, which analyzes the samples. Witham tests for amphetamines, barbiturates, benzodiazepines (such as Valium and Librium), cocaine, opiates, PCP, marijuana, alcohol, and nicotine. Testing is done on an Emit Immunoassay instrument which has an accuracy rate of greater than 95%. If there is an initial positive detection, the sample is immediately retested using gas chromatography, which has a better than 99% accuracy. The tested-for substances all have different detection periods, ranging from alcohol, which leaves the body in a matter of hours, to marijuana, which may take up to thirty days.

Test results are returned to the school in two or three days. If the test result is positive, the student and family are informed and given an opportunity to explain to the principal the result (for example, by producing a student's prescription medication that would cause the positive test). Without an explanation, the student is barred from extracurricular activities until a retest is passed. Positive test results are reported to persons in charge of extracurricular activities only on a need-to-know basis.

After a positive test result, a student can immediately request a new urine test at the student's own expense. The alternative is for the student to be retested after an interval of time, typically when Midwest returns for the next testing session. This retest is at the school's expense. A positive result on the retest results in a continuing prohibition from participation in extracurricular activities until the student tests negative. However, a student is only permitted one retest paid by the school system. All subsequent retests are at the student's expense.

Positive tests results are kept confidential, except as noted above. They are not to be used in school disciplinary proceedings; however, they could be subpoenaed in criminal or juvenile proceedings. The stated goal of the Program is to provide help for those who test positive. If a student has a positive test result, parents or guardians are given names of agencies that may be able to assist the student.

The High School does reserve the right to test any student at any time if it has reasonable suspicion of drug use. Two positive tests under the Program are deemed to be reasonable suspicion. Therefore, a student who tests positive twice may be retested at any time; tests based on reasonable suspicion, unlike Program tests, do subject the student to school discipline.

Since the implementation of the Program, five or six random tests have occurred, involving roughly twenty to thirty students each time. In the first three tests, three to five students per test had positive results. Since then, only two to three students have tested positive. Out of all the positive test results, three or four students tested positive

the Program does not appear to require testing for attendance at school functions such as

dances. This type of testing is therefore not currently before the court.

for marijuana; the remainder tested positive for tobacco.

The motivation for implementing the Program is stated to be concern about the use of these substances by students, but the particulars of the origin of that concern are somewhat sketchy. Both Wilson and assistant superintendent Bet Kotowski ("Kotowski"), who is in charge of the Program, cited a subjective perception that drug use was growing among the students of Rush County. They also cited a general concern of rising drug use in society. In addition, they cited a few discrete incidents. In the 1970s a senior on the track team drowned on a school trip due to suspected alcohol use. More recently, an automobile crash involving Rush County High School students occurred during a summer vacation when students in the car were "huffing," which is the inhaling of contents from aerosol cans. The Defendants have also mentioned the arrests in April of this year of six current and former High School students for drug dealing. However, this final incident occurred after the implementation of the Program, and is not considered as relevant.

The empirical data available in the case is somewhat slight. A list of expulsions and suspensions was submitted for the years 1992 to the present. When broken down by category and year, the data shows that for each school year, there have been no alcohol-related expulsions, between zero to one tobacco-related expulsion per year, and between one to four drug-related expulsions per year. There have been two to nine alcohol-related suspensions per year, twenty-one to forty-four tobacco-related suspensions per year, and one to nine drug-related suspensions per year. There is no consistent increase or decrease in numbers over the years, with numbers in all categories fluctuating from year to year.

A 1994 survey of drug and alcohol use in Rush Country was also submitted. This survey indicates that statistically significant findings for the year were that: (1) Daily and monthly cigarette use for Rush County 10th-grade students was higher than state rates, which were higher than national rates; (2) the monthly and annual use of alcohol was lower than state rates for 9th-grade students, but higher than the state rates for 11th-grade students; (3) annual, lifetime, and daily marijuana use among 9th and 12th grade students was lower than the state rates, and; (4) states rates overall tend to be lower than national rates, with tobacco use being a notable exception.

There are 950 students at the High School for the current school year. Of these, 728 signed with the Program. Of the 728, 170 neither participate in extracurricular activities nor drive to school. Plaintiff William Matthew Todd ("Todd") is currently a freshman at the High School. Before the effective date of the Program, Todd was a volunteer videotaping the football team (he was not actually a football player). His parents refused to sign the consent form for the Program, and as a result he has been barred from videotaping the football team.[3] Plaintiffs Anne Hammons ("Anne"), Steve Hammons, Jr. ("Steve"), and Jennifer Hammons ("Jennifer") are also students at the High School. Anne is a senior, and was a member of the Library Club. Steve is a junior who was in the Future Farmers of America. Jennifer is a sophomore, and has not yet participated in any extracurricular activities, but may wish to in the future. All three cannot currently participate in any extracurricular activities due to their parents' refusal to sign the consent form for the Program.

Extracurricular programs are a privilege at the High School. However, they are considered valuable to the school experience, and participation may assist a student in getting into college. Approximately 40% of High School graduates go on to attend college.

## II. Standard for Summary Judgment

The Seventh Circuit stated the standard for summary judgment in *Logan v. Commer-*

---

3. Interestingly, Todd's father is a recently retired 20-year veteran of the Rush County Sheriff's Department, where he served, among other duties, as an undercover officer in drug investigations. He has stated that he does not believe that drug problems at the High School have grown worse in the last five years.

*cial Union Ins. Co.,* 96 F.3d 971 (7th Cir. 1996):

> Under FED. R. CIV. P. 56(c), summary judgment is warranted only if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law."

The initial burden of production rests with the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

*Id.* at 978. If there is no genuine issue of material fact, as in this case, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011, 1014 (7th Cir.1996).

## III. Discussion

This case presents a classic constitutional battle. At issue is a pure decision of law, namely whether the random drug testing of students involved in any extracurricular activity violates the Fourth Amendment right (and analogous Indiana constitutional right) to be free of unreasonable searches and seizures. The federal question will be addressed first, and, as will be seen, the result on that issue will make it unnecessary for the Indiana constitutional question to be reached.

 There are some baselines to set out. First, it is without question that students do not "shed their constitutional rights ... at the school-house gate." *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Second, it is also clear that students are entitled to somewhat less stringent protection of their rights in a school setting; for example, schools need only have "reasonable suspicion" in order to perform a traditional search and seizure. *New Jersey v. T.L.O.,*

469 U.S. 325, 346, 105 S.Ct. 733, 745, 83 L.Ed.2d 720 (1985). Third, it is clear that the urinalysis drug-testing program qualifies as a "search" regulated by the Fourth Amendment. *Chandler v. Miller,* —— U.S. ——, ——, 117 S.Ct. 1295, 1300, 137 L.Ed.2d 513 (1997); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989).

 Normally, to be a "reasonable" search under the Fourth Amendment, individualized suspicion is required. As the Supreme Court recently stated, however:

> To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. . . . But particularized exceptions to the main rule are sometimes warranted based on "special needs, beyond the normal need for law enforcement." . . . When such "special needs"—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties.

*Chandler,* —— U.S. at ——, 117 S.Ct. at 1301 (citations omitted). This exception was applied to the school context once before by the Supreme Court, in the case of *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). It is this case which is the focus of conflict between the two parties.

In *Vernonia,* the Court evaluated the constitutionality of a random drug-testing requirement for students who wanted to participate in athletic events. Students who did not allow themselves to be tested could not participate in athletic events. *Vernonia,* 515 U.S. at 649–51, 115 S.Ct. at 2389. The program had been motivated by the observed "sharp increase" in disciplinary problems due to drug use. *Id.* The student body was in a "state of rebellion," and this was being led primarily by members of the athletic clubs. *Id.* The coinciding of a nearly three-fold increase in disciplinary problems, plus direct observation by the staff, indicated that there was a problem of "epidemic proportions."

*Id.* In addition, there had been several recent incidents of accidents and injuries in athletic competition due to drug use. *Id.*

The Court ruled that the drug testing program for student athletes did not violate the Constitution, citing a number of factors. First, the Court noted that the privacy interest of public school children was significantly less than that of the regular population. *Id.* at 655–57, 115 S.Ct. at 2392. The Court pointed out that the schools stand as "in loco parentis," and that public school children are regularly subjected to physical examinations of various kinds. *Id.* at 653–57, 115 S.Ct. at 2391–92. The court went on to point out that privacy concerns were even smaller in the case of student athletes, who give up considerable privacy (e.g., the locker-room shower) in order to participate in their sport. *Id.* at 655–58, 115 S.Ct. at 2392–93. The Court also noted that high school athletics are heavily-regulated activities, which the student athletes volunteer to join. *Id.* at 657–58, 115 S.Ct. at 2393. Finally, the court noted that there was a particular danger involved in drug use by student-athletes, namely the increased possibility of injury during physical activity. *Id.* at 661–63, 115 S.Ct. at 2395.

The Program in this case is essentially identical to the one in *Vernonia*, with one key difference: the program applies to all extracurricular activities, not just athletics. The Defendants have seized on the closeness of the program to *Vernonia* as a justification of its constitutionality, and seek to use the "in loco parentis" rationale to extend coverage to all extracurricular activities.[4]

The Plaintiffs offer two arguments. First, they argue that there is no evidence of a drug crisis in this case similar to the one in Vernonia. In support of this, they cite the discussion of *Vernonia* in the recent Chandler decision, and the pre-Vernonia decision of *Brooks v. East Chambers Consolidated Ind. Sch. Dist.*, 730 F.Supp. 759 (S.D.Tex. 1989), *aff'd*, 930 F.2d 915 (5th Cir.1991). Second, they argue that the difference in the

programs-student athletes versus all extra-curricular participants-renders the Program unconstitutional, at least as it applies to the non-athletic extracurricular participants. In support of this, the Plaintiffs point to the athletic-specific language in *Vernonia*, and the Seventh Circuit case of *Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309 (7th Cir.1988).

Unfortunately for the Plaintiffs, both arguments come up somewhat short after a careful review of the *Vernonia* decision. Turning to the first argument, it is true that the Defendants have not shown a level of drug involvement equivalent to that of the *Vernonia* school. The empirical evidence is not particularly indicative of drug, alcohol or tobacco use by a majority (or even a large minority) of the students. Also, the subjective observations are somewhat vague, interspersed with what appears to be a motivating view that society in general has a drug problem; this view is not necessarily incorrect, but it does not tend to indicate any specific concern about Rush County in particular. There also is very little to indicate that students in extracurricular activities are "ringleaders" of a drug rebellion, as in *Vernonia*.

If this were a case like *Chandler*, where the state of Georgia was attempting to create out of whole cloth a "special need" for the testing of adult political candidates, such evidence may not be sufficient to show that need. *Chandler*, —— U.S. at ——, 117 S.Ct. at 1303. If the leading precedent on this question was the *Brooks* case, the evidence may also be insufficient, as that case required a showing that extracurricular participants were more likely to use drugs or that students were being injured by drug use. *Brooks*, 730 F.Supp. at 764. However, the controlling precedent is *Vernonia*, and that case indicates that the evidentiary hurdle for a public school is lower than in other contexts. The court states generally that, "We have found such "special needs" to exist in the public-school context." *Vernonia*, 515

---

4. In fact, the Defendants suggest, and submit law review articles arguing, that the rationale behind *Vernonia* would allow for the testing of the entire student population. However, that scenario is not before this court, just as it was not before the

*Vernonia* court. The only question is whether such a testing regime can be applied to students wishing to participate in extracurricular activities.

U.S. at 651–53, 115 S.Ct. at 2390. The Court first noted the general importance of "[d]eterring drug use by our Nation's schoolchildren," noting that the impact of drugs on children heightened the already high concern over drug use in general. *Id.* at 661–63, 115 S.Ct. at 2395. The Court then went on to state:

> The most significant element in this case is the first we discussed: that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care .... when the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake.

*Id.* at 663–67, 115 S.Ct. at 2396–97. The Court noted that, as in this case, there was no significant opposition to the drug testing program by the community during its planning phases. *Id.* at 665–67, 115 S.Ct. at 2397. Accordingly, the evidence presented, while perhaps not rising to raging epidemic levels, can support a finding that there was a "special need" for the Program in Rush County. There is no minimum triggering point of substance abuse (such as ten percent or fifty percent of the student population) that must be met to justify the "important enough" interest on the part of the school system discussed in *Vernonia.* Some use of these prohibited substances by youth may give rise to legitimate concern about the potential for a rapid increase in abuse, if unchecked.

This leaves the Plaintiffs' second argument, that the extension of this particular Program to cover all extracurricular activities renders it unconstitutional. It is true that *Vernonia* contains language that points out special aspects of athletics that influence the issue: for example, the lack of privacy, the possibility of injury, and the voluntary submission to a heavily-regulated activity. It is also true that the Seventh Circuit in deciding a 1988 case essentially identical in facts to *Vernonia,* stated that, "we believe that sports are quite distinguishable from almost any other activity. Random testing of athletes does not *necessarily* imply random testing of band members or the chess team." *Schaill,* 864 F.2d at 1319 (emphasis added).

■ In the end, however, any perceived differences between the student athletes in *Vernonia* and the non-athlete extracurricular participants in this case turn out to be more ethereal than real. As the court in *Vernonia* stated, all public school students have a diminished expectation of privacy; the Court simply pointed out that athletes have even lower expectations. Furthermore, the possibility of injury is not simply isolated to athletic activity. While the possibility of injury is exacerbated in athletic activity, it is not isolated only to those situations; for example, those students who drive to school under the influence of drugs may face an even greater threat of injury than might an athlete on the field. Certainly, the Rush County school system has some responsibility for the health and safety of its students during all extracurricular activities (and while traveling to school). While chess or debate matches may seem to pose little risk of physical harm, traveling to and from them can include risks exacerbated by drug or alcohol use. Finally, while perhaps not to the level of being regulated by the Indiana High School Athletic Association, extracurricular activities, like sports, are voluntary activities which submit the students to extra rules and regulations. Participation in extracurricular programs is voluntary and a privilege; any student joining these activities is subject to regulation beyond that of a non-participant. Also, much like athletes, students in other extracurricular activities can take leadership roles in the school community and serve as an example to others. Being elected class president may put a student in a venerated position, much like that of a star athlete. In fact, the same could be said of any student who participates and excels in an extracurricular activity. Thus, the school has an interest in the conduct of those who may serve as an example to others. In the final analysis, the reasoning of *Vernonia* seems to hold true for any student who is a member of an extracurricular activity. The Court simply pointed out these reasons were especially applicable to student athletes. Accordingly, the Defendants motion for summary judgment as to the Fourth Amendment claim is **GRANTED,**

and the Plaintiffs' motion for summary judgment on this claim is **DENIED.**[5]

 This leaves the Indiana Constitution, which the Plaintiffs argue offers greater protection against search and seizure. How much greater is not made clear. In any event this is not an issue that this court has to decide, especially when the issue would be better decided by an Indiana court. At the outset of this case, the court had original jurisdiction pursuant to 42 U.S.C. § 1983, thus giving the court, by authority of 28 U.S.C. § 1367(a), supplemental jurisdiction over Plaintiffs' state law claim. However, because the court will grant the Defendants' motion for summary judgment and dismiss the § 1983 claim, original jurisdiction is now lacking and Plaintiffs' supplemental claim against the Defendants may be properly dismissed pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the court chooses to exercise its discretion under 28 U.S.C. § 1367(c)(3), and hereby **DISMISSES WITHOUT PREJUDICE** Plaintiffs' state law claim against Defendants. Plaintiffs should note that they have up to thirty days from the date of this order during which they may re-file in the appropriate state forum. 28 U.S.C. § 1367(d).

### IV. Conclusion

For all of the reasons stated above, the court finds as follows: (1) the Plaintiffs' motion for summary judgment is **DENIED;** (2) the Defendants' motion for summary judgment is **GRANTED;** (3) the Plaintiffs' Fourth Amendment claim under 42 U.S.C. § 1983 will be **DISMISSED WITH PREJUDICE;** and (4) the Plaintiffs' claim under the Indiana Constitution will be **DISMISSED WITHOUT PREJUDICE.** A judgment will be entered consistent with the terms of this entry.

5. The Plaintiffs allude (in their brief at page 20, n. 4) to the potential overbreadth of the Program regarding tobacco, in that some of the students may be over the age of 17, thus, their use of tobacco off school grounds may not be illegal. However, that argument was not developed and,

### JUDGMENT

This matter came before the court on Plaintiffs' motion for summary judgment under FED. R. CIV. P. 56, and Defendants' cross-motion for summary judgment under the same rule; and the court, having made its Entry, hereby (1) **DENIES** the Plaintiffs' motion for summary judgment; (2) **GRANTS** the Defendants' motion for summary judgment thus **DISMISSING WITH PREJUDICE** Plaintiffs' 42 U.S.C. § 1983 claim, and (3) **DISMISSES WITHOUT PREJUDICE** Plaintiffs' state law claim. It is therefore **ORDERED** that **JUDGMENT** be entered in favor of Defendants and against Plaintiffs. This cause is dismissed.

while one of the Plaintiffs (Anne) is 18, the factual submissions did not justify considering that potential in this case. Therefore, this court will not consider that issue in this case as it is not ripe.