**Brady Eugene TANNAHILL, a Minor, by His Father and Next Friend Larry Eugene TANNAHILL, Plaintiff,**

v.

**LOCKNEY INDEPENDENT SCHOOL DISTRICT, et al., Defendants.**

No. 5:00–CV–0073–C.

United States District Court, N.D. Texas, Lubbock Division.

March 1, 2001.

Michael F. Linz, P.C., Dallas, TX, Graham A. Boyd, New Haven, CT, for plaintiff.

Donald G. Henslee, Henslee, Fowler, Hepworth & Schwartz, Austin, TX, Hermon L. Veness, Jr., Henslee, Fowler, Hepworth & Schwartz, Dallas, TX, for defendants.

## MEMORANDUM OPINION

CUMMINGS, District Judge.

On this day the Court considered Plaintiffs', Brady Eugene Tannahill's ("Tannahill") and Larry Eugene Tannahill (collectively, "Plaintiffs"), Motion for Summary Judgment, filed December 15, 2000. Defendants, Lockney Independent School District ("the District") and members of the District's Board of Directors (collectively, "Defendants"), filed a Response on January 5, 2001.

Also before the Court is Defendants' Amended Motion for Summary Judgment, filed January 2, 2001. Plaintiffs filed a Response to the District's Motion on January 5, 2001. After considering all relevant arguments and evidence, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment and **DENIES** Defendants' Motion for Summary Judgment.

## I.

### BACKGROUND

The facts that comprise this lawsuit are largely stipulated by the parties. Lockney Independent School District is an independent school district established and organized under the laws of the State of Texas. Tannahill was a sixth-grade student at the District at the time this lawsuit was filed; he is presently enrolled in the seventh grade at the District.

For a number of years, the District maintained what the parties identify as a "Reasonable Suspicion Drug Testing Policy" for its students. Staff members of the District, upon having a reasonable suspicion[1] that a student is under the influence of a drug or alcohol while at school or a school-related activity, were authorized to require the student to submit to drug or alcohol testing. No student was ever tested under the Reasonable Suspicion Drug Policy.

In addition, the District also maintained a voluntary drug testing policy by which a parent and/or student could request that the student be tested for drug use. One paragraph of the policy notes that the District's School Board "affirms the fact that *parents* are the main force in influencing their children and should bear the primary responsibility in controlling their children in relation to drug use outside of school hours." (Emphasis in original). According to the parties' stipulations, no parent took advantage of the voluntary drug testing policy, and no student was ever tested under the policy.

On or about September 8, 1997, officials from the City of Lockney and Floyd County and school officials met at Lockney City Hall to discuss what they perceived to be community and school drug problems. Three days later, the District's Board of Trustees ("the Board") met to discuss the alleged drug problem in the district; the Board addressed drug testing as a viable option.[2] The District's superintendent then prepared letters to parents and churches, encouraging community members to attend a meeting on September 30, 1997, to discuss and address drug issues. On September 30, 1997, the Lockney community met in the District's high school gymnasium to discuss the perceived drug problems. Audience members posed approximately sixty questions to a panel

---

1. According to the policy, reasonable suspicion appears to exist when a student exhibits "at-risk" behaviors or when a drug dog "alerts" to the presence of drugs.

2. The Board met again on September 22, 1997, to discuss the perceived drug problems and address the viability of a drug testing policy.

composed of a drug counselor, juvenile authorities, law enforcement officials, a judge, and a district attorney.

The Board met again on October 9, 1997, one week after the District received a letter from its attorney advising against a mandatory drug testing program in Lockney schools, and voted on whether to approve a mandatory drug testing program for all extracurricular activities. The proposal was defeated by a 4–3 vote; Board members voting against the policy apparently made it clear they would support only a drug testing policy that applied to all students. On October 21, 1997, the Board passed a resolution offering students and parents the opportunity to participate in a voluntary drug testing program.

A bi-annual survey administered to more than 200 students in ninth through twelfth grades in the spring of 1998, the Texas School Survey,[3] concluded that "[o]verall, the use of illicit drugs, and of marijuana in particular, among Lockney ISD secondary students in 1998 was lower than that reported by their counterparts statewide."[4] That same year, on September 29, 1998, nine Lockney residents were arrested and charged with delivery of a controlled substance. Fourteen indictments on a total of

eleven individuals were handed down by the Grand Jury. None of those charged or arrested were students of or employed by the District.[5]

According to the summary judgment evidence, the Board again discussed a drug testing program in September of 1999. After a survey given to the District's teachers showed a strong desire to implement a mandatory drug testing program for students,[6] the Board initially voted on November 2, 1999, to implement a mandatory drug testing plan for all students in the District in grades 6 through 12. A final copy of the policy was approved on December 16, 1999, with implementation scheduled for the first week in February 2000. The parties agree that drug use had not increased in Lockney schools during the period leading up to adoption of the District's drug policy.

The District's rationale for the new policy reads as follows:

> Based on input · from staff, students, community members, parents, and law enforcement officials, it has been determined that there is a significant drug and alcohol use (and possibly abuse in some instances) among students, to a

3. The Texas School Survey "is an annual collection of self-reported tobacco, alcohol, inhalant, and substance use data from elementary and/or secondary students in individual districts throughout the State of Texas." It is conducted by the Public Policy Research Institute in conjunction with the Texas Commission on Alcohol and Drug Abuse.

4. Results of the survey indicate that Lockney students' use of particular substances in their lifetime is slightly higher than the state average in only two categories: tobacco (66% of Lockney students versus 60% state average) and inhalants (22% of Lockney students versus 20% state average). The drug screen used in the District's plan does not test for inhalants.

5. One witness, however, did testify that the drug dealers were selling to 14–year–olds.

6. It is not clear how many surveys were distributed. The Court finds that of the 69 respondents who returned the survey, 51

(73.9%) indicated an unequivocal "yes" or similar response to the question, "Do you believe the problems are severe enough to warrant mandatory drug testing?"; 10 (14.5%) indicated an unequivocal "No" answer; 5 (7.2%) indicated they were undecided or equivocated in their answers; and 3 (4.3%) provided no response to the question. However, when asked, "What is your perception of student drug use? (i.e., what is your opinion of percentage of students in Lockney Schools who use some form of drugs)," the estimates varied widely: from 85% to 5% of high school students and 60% to 3% of junior high students. Furthermore, the Court finds that 57 (82.6%) of the respondents replied that "rumor," "hearsay," "gut feelings" or "just guessing" provided some basis for their opinions. Some respondents indicated they included alcohol or tobacco use in estimating their percentage of drug users.

point that warrants implementation of a drug testing program.

The original plan then implemented the following:

> All students [in grades six through twelve] and their parents will sign a consent form agreeing to be a part of the drug testing program for Lockney ISD. During initial implementation, all students will take a mandatory drug test, and all students will be involved in random testing equivalent to a minimum of 10% of the group per month. In subsequent years, incoming sixth graders will take a mandatory drug test, and all students, grades six through twelve, will be involved in random testing at an equivalent to a minimum of 10% of the group per month. Students entering the district after the first day will be given the test at the next random testing date. **Parental consent for a student to submit to biological testing is required as a condition, grades six through twelve, to be in good standing as a student at Lockney ISD and to be able to participate in activities.** Any refusal by the student and/or parent, to sign the consent form will be treated as a positive test, and subject the student to consequences set forth in this policy, and in accordance with [the] student handbook and the Student Code of Conduct.

> At the discretion of the principal, superintendent and board of trustees, a mandatory testing of all students may be conducted at any time.[7]

(Emphasis in original; alterations added). When a student is tested, he or she is required to produce a urine sample in two bottles. Students and their parents have the opportunity to provide information concerning any prescription medication being taken by the student. Parents may also request to be in attendance during the specimen collection.

In the event that a student tests "positive,"[8] the parents or guardians of the student have an opportunity to request a second test using the second bottle. Parents may also choose the certified lab to perform the second test. If the retest results are also "positive," the parents or guardians are financially responsible for the cost of the retest, and the student will be subject to the consequences of the policy, the student code of conduct, and the student handbook.

Pursuant to the drug testing policy, a parent's refusal to consent to drug testing[9] is construed as the equivalent of a "positive" test. With the exception of students testing positive for tobacco,[10] the student's first offense subjected him to, *inter alia*, suspension from participation in all extracurricular activities for 21 days[11] and removal to in-school suspension for a

---

7. The District deleted all language beginning with the boldfaced type through the remainder of the section when it recently amended its drug testing policy.

8. In addition to a screen for tobacco use, the drug screen also tests for opiates, cocaine, amphetamines, cannabinoids, phencyclidine, barbiturates, methaqualone, benzodiazepines, methadone, and propoxyphene.

9. The parties agree the same consequences would occur for parents or students who withdraw their original consent to the test.

10. Students testing positive for tobacco are subject to the following consequences:

> 1. Parents will be notified that their child has tested positive for tobacco use.

> 2. Sponsors of appropriate extra-curricular activities will be informed of the positive test. This information should be utilized primarily as a mechanism for counseling in the first positive test. For subsequent positive tests, the sponsor may apply consequences as outlined in guidelines for that activity and the Student Code of Conduct.

11. The parties stipulate to the following statement:

> When a positive drug test causes a student's removal from extracurricular activities, it would be apparent to the activity coach and participants in the activity that the child has tested positive for drugs, since the only reason for a sudden 21–day removal from the activity is the fact that the student tested positive.

minimum of 3 days. Continued refusal of a parent to consent to the child's being tested for drugs would, as with continued positive test results, result in escalation of the aforementioned punishments, up to placing the child in. alternative school and disqualifying him from participating in any activity or receiving any honors for the year. The parties agree that a student removed from extracurricular activities under the policy would be excluded from the activity itself (*e.g.*, school band at football games), as well as enrollment in any academic course offered for credit which the student is required to attend in order to participate in the activity (*e.g.*, band class).

In mid-January of 2000, the parental consent forms were distributed to students. With the exception of the Plaintiffs, all parents consented to have their children submit to the drug test; testing of students and staff occurred February 2–4, 2000. The drug tests indicated that five students or staff members tested positive for marijuana use. Plaintiffs objected and refused to consent to the drug testing policy and properly followed the administrative appeals requirements of the District. Their appeals were denied. Plaintiffs then filed suit for injunctive and declaratory relief.

In all, during the course of drug testing a pool of approximately 400 junior high and senior high students, including the mandatory and random drug tests under the District's drug policy, a total of eleven students have tested positive for marijuana use. No students have tested positive for alcohol or any other drugs.

In July of 2000, the District revised its drug testing policy by eliminating the requirement that sixth grade students submit to the mandatory drug tests. In addition, rather than treating a refusal to consent to a drug test the same as a positive test result, the consequence for refusing to consent to a drug test results in "removal from participation in all extracurricular activities until participation in the drug testing program." Further-

more, the parties have stipulated to staying enforcement of the District's drug policy until such time as this dispute is resolved in the courts.

## II.

### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. *Id.* In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED.R.CIV.P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993). To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. Rather, the non-movant must

present sufficient evidence upon which a factfinder could reasonably find in the nonmovant's favor. *Id.*

### III.

### ANALYSIS

The Court begins with a recent and straightforward statement by the U.S. Supreme Court regarding suspicionless searches: "The Fourth Amendment requires that searches and seizures be reasonable. A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000) (O'Connor, J.) (citing *Chandler v. Miller,* 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997)). The Court encounters such allegations in the case at bar. Although the Supreme Court has upheld the constitutionality of some suspicionless searches which are designed to serve "special needs, beyond the normal need for law enforcement," the Court does not find that such special needs exist in the present case.

A 1989 district court case affirmed by the Fifth Circuit Court of Appeals, *Brooks v. East Chambers Consol. Indep. Sch. Dist.,* 730 F.Supp. 759 (S.D.Tex.1989), *aff'd,* 930 F.2d 915 (5th Cir.1991) appears to be controlling on the question at bar. In *Brooks,* the U.S. District Court for the Southern District of Texas examined a school district's mandatory, suspicionless drug testing program for all students in grades 7–12 who participated in extracurricular activities.[12] Much like the facts presented in the present case, there existed "very little evidence that drug or alcohol abuse by [the district's] students constituted a major problem in the operation of the schools." *Id.* at 761. (Alterations added). Furthermore, "[t]he school district evidently is responding with its program to a perceived public demand that the schools 'do something' about the general societal problem of substance abuse." *Id.*

After determining that a "search of students for drugs by school officials is considered state action,"[13] the court analyzed the district's policy to determine whether it violated the Fourth Amendment. At that time, the Supreme Court had previously held that "reasonableness"—not probable cause—was the proper standard of determining whether a public school official's search of a student was constitutional under the Fourth Amendment. *See New Jersey v. T.L.O.,* 469 U.S. 325, 343, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In other words, the district court required the school district to show either (1) the actions were "based on individualized suspicion that the search will discover evidence of wrongdoing," or (2) the testing program was prompted by the existence of extraordinary circumstances, satisfying a compelling interest analysis. *Id.* at 764.

The school district admitted that the general testing program was not based on individual suspicion of drug use. Furthermore, the court found that the district failed to show "that participants in extracurricular activities are much more likely to use drugs than non-participants, or that drug use by participants interfered with the school's educational mission much more seriously than does drug use by non-participants." *Id.*

---

12. Interestingly, the district court observed the following about the drug testing program: The testing program in place at [the District] is the most intrusive of any school district in Texas. It tests the widest range of students, grades seven through twelve—originally grades six through twelve—participating in extra-curricular activities. In the [District], that is over half the student body.... It is an across-the board, eagle eye examination of personal information of almost every child in the school district. It is difficult to imagine any search of school children being more intrusive.

In the case at bar, this Court is faced with a drug search policy even more intrusive than that addressed in *Brooks.*

13. *See id.* at 762.

In conclusion, the court found the school district's drug testing policy was unconstitutional:

> The intrusion on personal privacy that the school child must undergo in the East Chambers County school system cannot be justified by the global goal of prevention of substance abuse. The urinalysis program is unsupported by the compelling interest the school authorities must have before they can implement the warrantless searches of the pupils.

*Id.* at 766. The Fifth Circuit Court of Appeals affirmed the district court without opinion in 1991.

As noted above, *Brooks* appears to be dispositive of the main question in this case. The District, however, argues that *Brooks* has been overruled by the United States Supreme Court and subsequent Fifth Circuit authority. The Court declines at this time to make such a determination, however, as the District has failed to make the requisite showing of "special needs" under these subsequent cases.

The U.S. Supreme Court examined the constitutionality of suspicionless drug testing four years after *Brooks* was affirmed, in *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), a case which tested a drug testing policy implemented in the midst of an "immediate crisis." The Court found the following facts to be relevant:

> Drugs had not been a major problem in Vernonia schools. In the mid-to-late 1980's, however, teachers and administrators observed a sharp increase in drug use. Students began to speak out about their attraction to the drug culture, and to boast that there was nothing the school could do about it. Along with more drugs came more disciplinary problems. Between 1988 and 1989 the number of disciplinary referrals in Vernonia schools rose to more than twice the number reported in the early 1980's, and several students were suspended. Students became increasingly rude during class; outbursts of profane language became common.
>
> Not only were student athletes included among the drug users but, as the District Court found, athletes were the leaders of the drug culture. This caused the District's administrators particular concern, since drug use increases the risk of sports-related injury. Expert testimony at the trial confirmed the deleterious effects of drugs on motivation, memory, judgment, reaction, coordination, and performance. The high school football and wrestling coach witnessed a severe sternum injury suffered by a wrestler, and various omissions of safety procedures and misexecutions by football players, all attributable in his belief to the effects of drug use.
>
> Initially, the District responded to the drug problem by offering special classes, speakers, and presentations designed to deter drug use. It even brought in a specially trained dog to detect drugs, but the drug problem persisted. According to the District Court:
>
> "[T]he administration was at its wits end and ... a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion. Disciplinary actions had reached 'epidemic proportions.' The coincidence of an almost three-fold increase in classroom disruptions and disciplinary reports along with the staff's direct observations of students using drugs or glamorizing drug and alcohol use led the administration to the inescapable conclusion that the rebellion was being fueled by alcohol and drug abuse as well as the student's misperceptions about the drug culture."

*Id.* at 648–49, 115 S.Ct. 2386 (Ellipsis and alterations in original, internal citations omitted). In response to the problem, the school district implemented a policy of requiring all student athletes to sign a form consenting to urinalysis drug testing; athletes were tested at the beginning of the

season for their sports and subject to random testing each week during the season. A seventh-grade student athlete refused to sign the testing consent form and was subsequently denied participation in football.

In deciding whether Vernonia's drug testing policy was constitutional, the Court began by determining the nature of the privacy interest intruded by the search, and found that student athletes enjoyed a lower privacy interest than both the general public and the remainder of the student body; athletes encountered daily activities of "communal undress," including "suiting up," showering, and changing clothes in locker rooms that are "not notable for the privacy they afford." *Id.* at 657, 115 S.Ct. 2386.

The Court then considered the manner in which the urine sample was collected and found that the intrusion upon the athletes' privacy interests was "negligible." *Id.* at 658, 115 S.Ct. 2386. During the testing process, male students were required to produce samples at a urinal, remaining fully clothed, and were only observed from behind, if at all. Female students were required to produce samples in an enclosed stall, with a female monitor standing outside the stall's door, listening only for sounds of tampering. The Court found that "[t]hese conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily." *Id.*

Next, the Court examined whether the school district demonstrated a compelling state interest necessary to support a program of suspicionless drug testing.[14] *Id.* at 661, 115 S.Ct. 2386. After considering a number of reasons justifying such a program, the Court determined that the Vernonia School District's need for the program was severe and that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." *Id.* at 663, 115 S.Ct. 2386. Weighing the decreased expectation of privacy, the intrusiveness of the search, and the severity of the need met by the search, the Court concluded that the district's drug policy did not violate the Fourth Amendment.

The Supreme Court again applied the special-needs analysis to drug testing issues in *Chandler* when it struck down a Georgia statute requiring candidates for state offices to pass a drug test. The Court stated that when "special needs" are alleged, courts must undertake a "context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at 314, 117 S.Ct. 1295. After reviewing prior Supreme Court cases addressing the constitutionality of suspicionless drug testing,[15] the Court found that the State presented no special needs other than to "display[ ] its commitment to the struggle against drug abuse." *Id.* at 321, 117 S.Ct. 1295. (Alterations added). The Court, by an 8–1

---

**14.** In other words, courts are instructed to determine whether the government demonstrates "an interest that appears *important enough* to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." *Id.* at 661, 115 S.Ct. 2386. (Emphasis in original).

**15.** *See Vernonia*, 515 U.S. at 646, 115 S.Ct. 2386; *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Court upheld Federal Railroad Administration regulations requiring blood and urine tests of rail employees in-

volved in train accidents or violating certain rules; railway employees, "by reason of their participation in an industry that is regulated pervasively to ensure safety," had diminished expectations of privacy); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (Court upheld Customs Service program that made drug tests a condition of promotion or transfer to positions directly involving drug interdiction or the carrying of a firearm; the Service held an "almost unique mission" as the "first line of defense" against the smuggling of illicit drugs into the United States).

margin, held that such concerns are insufficient to demonstrate a "special need":

> Georgia asserts no evidence of a drug problem among the State's elected officials, those typically do not perform high-risk, safety-sensitive tasks, and the required certification immediately aids no interdiction effort. The need revealed, in short, is symbolic, not "special," as that term draws meaning from our case law.... Indeed, if a need of the "set a good example" genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in *Skinner, Von Raab,* and *Vernonia* ranked as "special" wasted many words in entirely unnecessary, perhaps even misleading, elaborations.

*Id.* at 321–22, 117 S.Ct. 1295.

The Fifth Circuit has also provided some guidance on the issue of suspicionless drug testing. Before the Supreme Court granted certiorari in *Chandler,* the Fifth Circuit had an opportunity to address drug testing in light of the *Vernonia* decision in *Aubrey v. School Bd. of Lafayette Parish ("Aubrey I"),* 92 F.3d 316 (5th Cir.1996). In that case, a Louisiana school board implemented a policy that required random, suspicionless drug testing for all school employees in safety-sensitive positions. An elementary school custodian for the district who was required to submit to the drug screen tested positive for the presence of tetrahydrocannabinol ("THC"), the active chemical in marijuana. Rather than attend a substance-abuse program in lieu of termination from employment, the custodian filed suit in federal court, asserting that his constitutional rights under the Fourth/Amendment were violated. The district court granted summary judgment

in favor of the school district, finding that the function of a custodian in an elementary school is "safety sensitive" due to the handling of poisonous solvents and lawn mowers which could be hazardous to young children. Upon appeal, the Fifth Circuit reversed the judgment of the district court, holding in part that "[n]o evidence was presented to show which positions are considered safety sensitive and which are not, or whether the policy at an elementary school would differ from that at a high school." *Id.* at 319.

On remand to the district court, the court again granted summary judgment in favor of the school district; the court found the school district had properly defined safety sensitive positions and that the custodian's job functions at the elementary school were safety sensitive. The custodian appealed.[16] In *Aubrey v. School Bd. of Lafayette Parish ("Aubrey II"),* 148 F.3d 559 (5th Cir.1998), the Fifth Circuit affirmed the judgment of the district court, holding that the elementary school custodian's job functions presented a special need to the school district:

> [T]he Board's need to conduct the suspicionless searches pursuant to the drug testing policy outweighs the privacy interests of the employees in an elementary school who interact regularly with students, use hazardous substances, operate potentially dangerous equipment, or otherwise pose any threat or danger to the students.

*Id.* at 565. Throughout the opinion, the Fifth Circuit placed emphasis on the fact that the custodian performed activities and used chemicals dangerous to children of elementary school age.[17]

**16.** By this time, the Supreme Court had issued its decision in *Chandler.*

**17.** For example, the court noted, "The custodial position was considered safety sensitive because of the handling of potentially dangerous machinery and hazardous substances in an environment including a large number of children ranging in age from three to eleven."

*Id.* at 559. Similarly, "we are persuaded that the failure of the Board to use significant caution in the selection and supervision of personnel performing such duties in a school that serves nearly 900 students, ranging in age from three to eleven, could place the children at significant risk." *Id.* at 563.

The Fifth Circuit had previously reached a different result that same year in *United Teachers of New Orleans v. Orleans Parish Sch. Bd.*, 142 F.3d 853 (5th Cir.1998). In that case, a school district implemented a policy which required pre-employment drug testing for all district employees, as well as, *inter alia*, testing due to reasonable suspicion of drug abuse, annual examinations, and following accidents occurring during the employee's course and scope of employment.[18] Teachers and other employees brought suit to attack the program, seeking a preliminary injunction. When the injunction was denied by the district court, appeal was brought.

While noting that "evidence of drug use on the job by teachers could identify a strong state interest," the Fifth Circuit found that "the testing here does not respond to any identified problem of drug use by teachers or their teachers' aid[e]s or clerical workers." *Id.* at 856. Furthermore, the court found an "insufficient nexus between suffering an injury at work and drug impairment." *Id.* Having found that the district's drug testing really addressed a "general interest in a drug-free school environment," the Fifth Circuit held that such concerns do not constitute a "special need," and reversed the judgment of the lower court. *Id.* at 856–57.

After examining the prior case law from the Supreme Court and Fifth Circuit regarding the use of suspicionless drug testing, this Court finds that two methods of establishing "special needs" have evolved. On the one hand, special needs can be shown in instances, as in *Skinner, Von Raab*, and *Aubrey II*,[19] when the individual subject to the test performs highly regulated functions concerning the public safety or special governmental roles. On the other hand, a school district can prove the existence of a special need by showing exigent circumstances and continued failure in attempts to alleviate the problem. *See Vernonia.* Furthermore, numerous cases have also made it clear that general concerns about maintaining drug-free schools or desires to detect illegal conduct are insufficient as a matter of law to demonstrate the existence of special needs.[20] With these general principles in mind, the Court evaluates Plaintiffs' claims that the District's drug testing policy is unconstitutional under the Fourth Amendment.

Because the parties do not dispute that the actions of the District constitute "state action," the Court examines the extent of the students' privacy rights under the Fourth Amendment. Although *Vernonia* extended the proposition in *T.L.O.* that "students within the school environment have a lesser expectation of privacy than members of the population generally,"[21] the Supreme Court pointed out that the student population as a whole enjoys a higher expectation of privacy than the student athletes subject to testing:

> School sports are not for the bashful. They require "suiting up" before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual site for these activities, are not notable for the privacy they afford. The locker rooms in Vernonia are typical: No individual dressing

---

**18.** The policy also provided "a program of random drug testing of those employees who occupy safety-sensitive or security-sensitive positions." *Id.* at 855. The parties apparently did not dispute that teachers do not occupy "safety-sensitive or security-sensitive positions."

**19.** *See also Pierce v. Smith*, 117 F.3d 866, 874 (5th Cir.1997) (finding a special need for drug testing for medical residents in the practice of medicine "an endeavor subject to extensive

governmental regulation, but also both a student-school and an employee-supervisor relationship.")

**20.** *See City of Indianapolis*, 121 S.Ct. at 454; *Chandler*, 520 U.S. at 314, 117 S.Ct. 1295; *United Teachers*, 142 F.3d at 857; *Brooks*, 730 F.Supp. at 765.

**21.** 515 U.S. at 657, 115 S.Ct. 2386 (quoting *T.L.O.*, 469 U.S. at 348, 105 S.Ct. 733).

rooms are provided; shower heads are lined up along a wall, unseparated by any sort of partition or curtain; not even all the toilet stalls have doors. As the United States Court of Appeals for the Seventh Circuit has noted, there is "an element of 'communal undress' inherent in athletic participation."

There is an additional respect in which school athletes have a reduced expectation of privacy. *By choosing to "go out for the team," they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally* .... Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy.

*Id.* at 657, 115 S.Ct. 2386. (Emphasis added; internal citations omitted). The students subject to drug testing in the Lockney School District comprise a much broader segment of the student population than the group of student athletes in *Vernonia.* Their expectations of privacy are higher. Students who do not participate in athletics are not subject to the same daily "communal undress" or public showering as student athletes; compulsory attendance at school is much different than voluntary participation in extracurricular activities.[22] The Court, applying the reasoning of the Supreme Court in *Vernonia,* finds that the student body in the District holds a higher expectation of privacy than student athletes.

With regard to the second factor—the intrusion upon students' privacy interests by the method of testing—the Court finds that such alleged intrusion is low. The manner in which the District collects urine for drug testing is very similar to methods implemented in *Vernonia* and *Aubrey—*

"nearly identical to those typically encountered in public restrooms." As such, the Court finds that the method of testing imposes a low intrusion on students' privacy interests.

As to the final factor—whether the District has demonstrated a compelling state interest to support its program of suspicionless drug testing—the Court finds that the facts of the case at bar militate against a finding that the District's interest is compelling. Despite the fact that the District's rationale for the new program identified "a significant drug and alcohol use (and possibly abuse in some instances) among students," and faculty members supported a drug testing program, a context-specific examination of the available summary judgment evidence simply does not lend support to the District's assertions. Although the District has maintained a reasonable suspicion drug program for years, no student was ever required to submit to drug testing. The parties agree that drug use has not increased prior to adoption of the District's new policy. A single incident during which nine Lockney residents were arrested and charged with delivery of a controlled substances provides little support for the District's showing of a "special need"; no students or employees of the District were charged or arrested.[23]

Furthermore, a study conducted in 1998 before implementation of the policy indicated that drug use was generally lower in the District than in other Texas schools. For the two substances in which results actually indicated slightly higher use by Lockney students—tobacco and inhalants—the Court finds that the District's drug screening does not even test for the use of inhalants. A positive test result for tobacco subjects the student to much lower sanctions than for other drugs. This is not an instance in which the District faced a

---

**22.** *See, e.g., Brooks,* 730 F.Supp. at 766 ("Every child, at least in Texas, must attend school. School attendance does not trigger an instant diminution of rights.")

**23.** Likewise, the Court gives little weight to the District's general assertion that drug stings had failed in the past as evidence of a drug problem in the schools.

drug problem of "epidemic proportions" as encountered in the "drug infested" Vernonia schools. Furthermore, the District's drug testing program is much broader than Vernonia's in the number of students tested; whereas Vernonia's athletes were only tested during their season of competition, the District's drug program subjects students to testing during the entirety of the school year.

The Court also rejects the District's assertion that junior high and high school students are similar to the subjects tested in *Skinner, Von Raab,* and their progeny, and that the desire to highly regulate drugs in school is, *de facto,* a sufficient "special need" to warrant suspicionless drug testing of students. Attending school is not akin to participation in a highly regulated industry as is the work place for railway employees, customs agents, residents who practice medicine, or even elementary school custodians. Moreover, the academic studies of a student, while very important, do not embody the immediate and severe life and death repercussions as do the decisions of these employees. A student's tools of pens, notebook paper, and protractors have never been equated with locomotives, the hazardous chemicals and equipment of a custodian, the firearms or interdiction efforts of a customs agent, or the prescription pads and EKG machines used by a physician.

■ The Court finds that, at best, the District's policy attempts to generally reduce drug use by students,[24] and finds that the suspicionless testing program is not specifically targeted to the special needs of a drug crisis or safety-sensitive job functions. Balancing the factors considered above, including students' increased expectation of privacy over that of student athletes, the unobtrusiveness of the method of testing, and the near dearth of evidence demonstrating a need to be met by the search, this Court finds that the District's drug testing program is unreasonable and hence unconstitutional under the Fourth Amendment.

The Court recognizes the good faith efforts of school districts in their attempts to win what has become a frustrating war on drugs; it understands the motives of the District to protect its students. The Court further recognizes that given advancements in technology and research, a mandatory drug policy of testing every teenage student could potentially eliminate drug use for such an impressionable segment of our population. But with such an intrusion also comes a great price to citizens' constitutionally guaranteed rights to be secure in their "persons, houses, papers, and effects." To quote Justice Brandeis in his now famous dissent in *Olmstead v. United States:*

> [I]t is ... immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.

*Chandler,* 520 U.S. at 322, 117 S.Ct. 1295 (quoting *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)).

**24.** This is perhaps best demonstrated in Defendants' *Response to Plaintiffs' Motion for Summary Judgment:*

> Plaintiff argues that because drug use among Lockney students is lower than Statewide or National averages, there is an acceptable tolerance or there really is no[t] a drug problem. This premise is akin to the FDA's declaration that a small measure of rodent hair or cockroach body parts is acceptable in hamburger meat. Yet, who wants rodent hair in their hamburger? Even if Lockney ISD's average is lower for drug use no parent would boast, "although my son uses crack cocaine regularly, at *least* he uses it less than the average kid in Texas."

(Alteration added; emphasis in original).

## IV.

### CONCLUSION

The Court finds that the District has failed to demonstrate a sufficient special need to justify suspicionless drug testing and that the District's program violates the Plaintiffs' rights under the Fourth Amendment as incorporated into the Fourteenth Amendment of the U.S. Constitution. Plaintiffs' Motion for Summary Judgment is **GRANTED.** Defendants' Motion for Summary Judgment is **DENIED.** Judgment for the Plaintiff shall be entered.

All relief not expressly granted is denied.

SO ORDERED.